Filed 1/20/15  P. v. Multani CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F066265 |
| Plaintiff and Respondent, | (Super. Ct. No. F11902125) |
| v. | |
| DALJIT SINGH MULTANI, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Daljit Singh Multani[1] of soliciting Joe Luis Yzaguirre, Jr. to murder Rama Kant Dawar (Pen. Code, § 653f, subd. (b)), but acquitted him of receiving stolen property. (Pen. Code, § 496, subd. (a).) Multani was sentenced to the low term of three years in state prison. On appeal, Multani contends: (1) the trial court erroneously admitted evidence that he committed domestic violence against his wife; (2) the trial court erroneously denied his motion for mistrial; and (3) his trial counsel was ineffective by failing to interpose timely objections to prosecutorial misconduct in closing argument. Finding no merit to these arguments, we affirm.

## FACTS

Rama Dawar was a silent partner in a limousine business with Multani; he contributed about $40,000 to the business in exchange for 50 percent of the profits. When the business started failing and bills were left unpaid, Dawar contacted Multani to find out what was happening. Eventually, two limousines were repossessed and Multani stopped communicating with Dawar. On July 22, 2010, Dawar filed a civil lawsuit against Multani to recoup his capital investment. Dawar obtained a default judgment when Multani did not respond to the litigation.

Multani's wife, Rachael Singh,[2] had worked for Dawar as an interpreter in a language translation business he owned. On September 26, 2010, after a fight with Multani, Rachael called Dawar to warn him that Multani was going to harm him "physically" and "emotionally," and was going to plot something against him. Dawar did not believe Multani could harm him, but decided to make an on-line police report just in case it was true.

---

[1] Both the information and the abstract of judgment list the defendant's name as "Daljit Singh aka Daljit Singh Multani." During trial, the trial court and the parties referred to the defendant as Mr. Multani. Accordingly, we will refer to him as "Multani."

[2] We will refer to Rachael Singh by her first name, not out of disrespect, but to ease the reader's task.

On February 15, 2011,[3] Multani, who also owned a towing business, called one of his employees, Joe Yzaguirre, who drove limousines for Multani and helped with releasing vehicles from the tow yard. Multani sounded "a little bit upset" and wanted to meet with Yzaguirre regarding a serious situation he wanted resolved. Multani asked Yzaguirre if he wanted to make "a pretty penny"; when Yzaguirre asked what he was talking about, Multani responded that he wanted to have someone killed. Yzaguirre believed Multani wanted him to do it.

The next day, Yzaguirre, who had a criminal past, called a Fresno Police Department (Department) detective he knew, Robert Gonzales, to report Multani's plan to murder Dawar.[4] Because the Department used Multani's towing service to impound vehicles, Detective Gonzales already knew Multani. At trial, Yzaguirre testified he came forward because he was fearful, as he believed Multani might kill him to ensure there were no leaks, he did not think he could live with himself if Multani hired someone else for the job, and Yzaguirre had an infant son. Yzaguirre, however, told police he came forward because he was tired of the way Multani was "treating people," as he often would not allow people whose cars were being towed to remove necessary items from their vehicles before towing.

The case was turned over to the Department's investigations unit; the lead was assigned to Detective George Imirian. Police first assessed Yzaguirre's credibility. Because Yzaguirre was not someone who would qualify as an informant due to his criminal background, the police treated him as a witness and decided to try substituting an undercover police officer for Yzaguirre, who would then interact with Multani to

---

[3] Subsequent references to dates are to dates in 2011 unless otherwise indicated.

[4] Yzaguirre met and became friendly with Detective Gonzales in late 2010 or early 2011, when Yzaguirre was driving a limousine Detective Gonzales and his friends had rented from Multani's business to attend an event.

develop the case. The undercover officer was given the code name "Davo." The plan failed, however, because Multani would only deal with Yzaguirre.

Between February 15 and March 9, Yzaguirre spoke with Multani by phone and in person; Yzaguirre told Detective Imirian about some, but not all, of these conversations. On March 9 and April 5, Yzaguirre met with Multani while wearing a wire; these conversations were recorded and were played for the jury.

During their conversations, Multani communicated the details of the plan to kill Dawar to Yzaguirre. Multani told Yzaguirre his dispute with Dawar was over a real estate lawsuit, and at one point he followed Dawar with his own gun intending to kill him, but changed his mind. Multani said he would provide the gun to kill Dawar. Yzaguirre told Multani that "Davo" would actually carry out the murder. Multani considered using his own gun, but ultimately rejected this plan because he did not want the murder traced back to him. Multani said he would pay Yzaguirre $2,000 and "take care of him in a sense of work."

Shortly before the murder was to take place, Multani contacted Yzaguirre and told him to go to a red, white and blue barn where an individual would give him a gun. Without notifying police, Yzaguirre went to the barn, retrieved the gun, which was wrapped in a red towel, and delivered it to Multani at his business.[5]

Several days later, on April 12, Multani took the towel-wrapped gun from his business and placed it into the trunk of Yzaguirre's vehicle.[6] Yzaguirre delivered the gun to the police. At trial, Jerry Savage identified the gun, a nine-shot .22 pistol, as his; it and five other guns were stolen from his Oakhurst home on July 8, 2010.

_____

[5] Yzaguirre revealed this gun transaction for the first time during the preliminary hearing.

[6] Yzaguirre was supposed to record his April 12 conversation with Multani via a recording device on a keychain, but Yzaguirre forgot to bring the keychain into the office.

Multani originally planned to be in the presence of a police officer when the murder was carried out by being on a "rotation" where he would accept calls from the California Highway Patrol or Department to tow vehicles, so he would have an alibi. He later decided to be at a family wedding in Phoenix, Arizona. Consequently, the code name for the plot became "Phoenix, Arizona." Multani gave Yzaguirre Dawar's business card, which contained Dawar's photograph and business address.

According to the plan, Yzaguirre was to be one of two limousine drivers taking Multani to the wedding in Phoenix. However, on the day they were to leave, Yzaguirre refused to go. Multani was upset and angry with Yzaguirre, but found another driver and went without Yzaguirre, leaving him with the parting instruction hat he had "better make sure that nothing goes fucking wrong."

Detective Imirian contacted Dawar on April 13 and told him about Multani's plot to kill him. On April 18, Multani was arrested upon his return from Phoenix.

***Defense Case***

Multani did not testify at trial, but through his defense, he denied plotting to kill Dawar. An attorney testified Multani hired him to overturn the default judgment Dawar had obtained against him; he filed a substitution of attorney form with the court on April 4. Multani attacked Yzaguirre's credibility, cross-examining him on his prior criminal activities and impeaching him with several witnesses from his past, who testified that Yzaguirre had either planned to, or did, commit thefts and robberies, and he was not an honest person. Yzaguirre's ex-girlfriend, Christine Sasser, testified that Yzaguirre obtained a restraining order against her because she called Yzaguirre's employer and told them he was a convicted felon; Yzaguirre, however, continued to have contact with Sasser and caused her to violate the order.

In 2006, Yzaguirre was incarcerated at the Fresno County jail with Craig Nelson and another inmate with the nickname Ty; the three became friends. According to Yzaguirre, Ty told him he was wrongfully incarcerated for spousal abuse, and he was

5.

furious with his wife and wanted to kill her.  Yzaguirre said he tried to talk Ty out of killing her and denied encouraging Ty to kill his wife.  Yzaguirre told his criminal defense attorney about Ty's plan.

Craig Nelson, however, testified that Yzaguirre had set-up the situation so he could report it and gain a sentencing advantage in his pending criminal case by asking Ty why he did not "just kill the bitch," "egging [Ty] on," telling Ty he would give him money and a gun, and giving him the phone numbers of his wife and two girlfriends, including Sasser, so Ty could get a message to him.   Nelson did not tell the jail officials about the set-up because Yzaguirre told him he was affiliated with members of the Bulldog gang.

Multani elicited evidence suggesting Yzaguirre had an inappropriately close relationship with the police, as he wore a police uniform, drove an older Crown Victoria that was black and white with police lights on top, rode in a police helicopter and had vehicle numbers checked through the police.  Multani's defense also asserted Multani told Yzaguirre to "hold off" on killing Dawar because he wanted to see what would happen with the civil lawsuit.

*Rebuttal*

Yzaguirre's defense attorney in a prior criminal matter, Barbara O'Neill, testified Yzaguirre reported the Ty murder plot to her without any expectation of leniency in his own criminal case.  At sentencing, both O'Neill, in argument, and Yzaguirre, through a letter to the court, requested leniency; the court did reduce his sentence from the three-year lid to two years.

Yzaguirre rode one time in a police helicopter under a civilian ride-along program.  Though such excursions generally are prohibited under Department policy, the policy allows a unit commander to approve a civilian ride-along on a case-by-case basis.  Yzaguirre's ride was approved by the chief pilot.  The Department conducted a vehicle

6.

identification number (VIN) check for Yzaguirre on a car he was considering buying; this service is provided to the general public.

A Department officer testified that anyone can purchase police uniforms from a uniform store and buy Department shoulder patches on-line. Yzaguirre testified he got the shirt from a uniform store and the patch from a yard sale, and he dressed as a police officer for Halloween. After Yzaguirre bought a former Texas police car, he removed the red and blue lights in the "light bar" and had the car painted so it would be legal. Yzaguirre admitted he wanted people to think the car was a police vehicle because he lived in a remote area and thought the vehicle's presence would bring him greater security.

On the day Yzaguirre obtained a restraining order against Sasser, Sasser left the courtroom before she was served with the order. When the courtroom deputy told her she could not leave, she said she would return after going to the bathroom, but she did not return. Sasser violated the restraining order multiple times by contacting Yzaguirre, but she denied doing so and said Yzaguirre was setting her up.

## DISCUSSION

I.    Admission of Evidence of Domestic Violence

Multani contends the trial court erroneously admitted evidence that he threatened and beat his wife Rachael. He claims the evidence suggested he had a predisposition to commit crimes and therefore was inadmissible under Evidence Code section 1101, subdivision (a),[7] should have been excluded under section 352 as irrelevant, was not proper impeachment evidence because he did not testify, and rendered the trial fundamentally unfair in violation of the federal due process clause.[8]

---

[7] Undesignated statutory references are to the Evidence Code.

[8] In the trial court, Multani did not object to the admission of this evidence on constitutional grounds and failed explicitly to make the constitutional argument he now advances. In this instance, it appears that the new argument does not invoke facts or legal

A. Pretrial Proceedings

At the preliminary hearing, Rachael denied having warned Dawar about Multani's plan to harm him.

During motions in limine, the admissibility of Multani's criminal history was debated. Among other things, the People moved to admit three arrests, in 2001, 2004 and 2010, and a 2004 misdemeanor conviction, all for corporal injury to a spouse (Pen. Code, § 273.5). According to the prosecutor, Multani's wife, Rachael, was the victim of all of the incidents of domestic violence.

In discussing whether the arrests were crimes of moral turpitude, the trial court noted that even if Multani did not testify, the ongoing course of threats and intimidation against Rachael might be admissible to explain why she would not testify adversely to her husband or admit she called Dawar. The trial court recognized both the prejudicial and probative value of the domestic violence evidence.[9] In weighing the evidence's probative value, the trial court found the evidence "highly probative" as to Rachael's credibility, but also acknowledged Multani could be prejudiced by it without ever taking

---

standards different from those the trial court itself was asked to apply; instead, he merely asserts that the trial court's act in admitting the evidence, "'insofar as wrong for the reasons actually presented to the trial court, had the additional *legal consequence* of violating the Constitution.'" (*People v. Brady* (2010) 50 Cal.4th 547, 557, fn. 4; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 (*Boyer*).) To that extent, Multani's new constitutional argument is not forfeited on appeal. (*Boyer*, *supra*, 38 Cal.4th at p. 441, fn. 17.) As explained in *Boyer*: "In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none." (*Ibid.*)

[9] The trial court noted neither section 1108 nor *People v. Linkenauger* (1995) 32 Cal.App.4th 1603, which held evidence of marital discord and the defendant's prior physical assaults against the victim were admissible to prove motive, intent and identity, applied because Singh had not been charged with domestic violence in the present case.

the stand. The trial court also contemplated whether the evidence's prejudicial impact could be overcome by a jury instruction.

The People argued the most probative domestic violence evidence was Multani's 2004 domestic violence conviction and the 2010 arrest. The trial court was reluctant to admit the older incidents and agreed with the defense that none of the domestic violence evidence was admissible to prove Multani was a violent person. The trial court noted that if Rachael testified she was not afraid of Multani, she could be impeached with the fact she reported incidents of domestic violence to police that implicated him. The trial court observed that much of the evidence of the couple's relationship "cut[] both ways," as exemplified by a recorded jail conversation between the two that established Rachael was financially dependent on Multani yet suggested she was not intimidated by him. The trial court reserved its ruling on whether to permit a further showing of bias based on the incidents of domestic violence and stated it would review the police report of the 2010 incident in making its ruling.

After taking the matter under submission, the trial court ruled that it would admit only the November 18, 2010 incident (the November incident), although the other incidents could be proper impeachment evidence if the circumstance arose. The trial court thought the November incident provided a solid basis for Rachael to fear Multani and to explain why she denied telling Dawar her husband was plotting to kill him, since the incident occurred two months after the call to Dawar. The trial court stated it would instruct the jury at the outset of trial on the limited use of the evidence and would reinstruct them both when the evidence was offered and in final instructions; it was confident the jury would follow these instructions.

The trial court reviewed the officer's report of the November incident and determined that the officer could testify as to most of the statements contained therein should a jury be able to infer that Rachael's failure of recollection of the November incident was feigned. Defense counsel objected to the report "coming in" and suggested

9.

the trial court "cleanse it, maybe leave out the violent part of it, about him pulling the gun on someone before, and just leaving it as to what he's done to her on this occasion." The trial court responded that was "part of the context" to show the extent of her fear. Defense counsel stated it would likely offer the recorded jail conversations between Rachael and Multani to establish she was not in fact intimidated by him. The trial court believed it had struck the proper balance under section 352 even though it was a "difficult issue." For the record, and for purposes of appeal, defense counsel objected to the admission of the domestic violence evidence as "being hearsay, 352 factors, and highly prejudicial to the defendant."

The trial court explained it had considered letting all of the incidents in, but none of them would come before the jury as long as Rachael simply testified she did not remember about the 2010 incident, which would then allow the prosecutor to impeach her with prior statements. The trial court explained that this "gives the jurors a fair piece of evidence they should be able to consider as to why she might have said one thing to Rama Dawar and another thing to the officer, but it doesn't so prejudice him that it would be undue prejudice, particularly since as to one incident and one witness I think I can very easily instruct the jurors to consider it for the limited purpose and expect they'd follow it. If we were marching in two or three days of testimony of officers with inconsistent statements, there's no way they could get there, and so I think it's . . . the kind of balance that the Court tried to strike so that the jurors get a fair picture of the case, and yet it doesn't unfairly prejudice the defendant. And I fully accept that that's an issue the defense would prefer to avoid and believes it unduly prejudicial, but I think I can trust the jurors to follow my instructions."

B. The Trial Testimony

Rachael was called to testify early in the trial. She denied hearing Multani say in September 2010 that he was going to harm Dawar and claimed she did not know Dawar had sued Multani until November 2010. Rachael admitted calling Dawar multiple times

10.

in September 2010, but she did not remember calling Dawar from a blocked number in mid-September.

When the prosecutor produced telephone records that showed she called Dawar on September 26, 2010 from a blocked number, Rachael admitted speaking with Dawar that day, but insisted she called him only to seek marital advice. She denied warning him that Multani wanted to "take everything from [him]" or that Multani was plotting to harm him "both physically and emotionally." She insisted she would not lie to protect her husband, though she admitting lying in the past when she accused him of domestic violence.

As to the November incident, Rachael testified she "might have" told police her husband grabbed the phone from her when she tried to call 911 and admitted going to a women's shelter. Rachael said she was upset by her sister's recent death, had stopped taking her medication, was being really loud and kicking the door, and Multani was just asking her to leave. She showed the responding officer the lump on her head and told him her husband had slammed her head against the wall.

At that point, the trial court interrupted and instructed the jury that this "entire line of questions and answers" regarding the November incident "may only be considered [by] you as how this testimony may affect, or events described may affect this witness' credibility. These statements may not be considered by you as evidence that the defendant is a dangerous person or for any other purpose, but only as they reflect upon this witness."

Rachael's testimony continued; she said she could not recall the details of the 2010 incident because she suffered a concussion. She testified Multani did not cause the concussion; she ran into the door by accident and blamed it on him as she had done many times before when she claimed he had assaulted her. She denied that her husband slammed her head into a cinder block partition inside the business. She did not recall telling the officer that: (1) she may have blacked out; (2) she felt dizzy and tried to get to her feet; (3) she grabbed the side of her head because she was afraid it was cut open due

11.

to how violently she was slammed against the wall; (4) she began to feel swelling on her head; (5) Multani told her he did not do a damned thing to her and began to push her out the door; (6) when she started calling 911 on her cell phone, Multani grabbed the phone from her hand; (7) Multani cornered her in the office when she ran in there to use the phone; (8) Multani drew a sword and put it to his own neck and then to hers; or (9) Multani threatened to kill her if she did not get out. Rachael asked if the responding officer was Steven Depew; while she did not remember him as the responding officer, she said "we've had problems with him in the past."

Rachael denied running to the women's shelter next door to her husband's business; she said she walked in that direction because the ladies there were calling for her. She also denied being scared of Multani as a result of this incident and again said she would not lie to protect her husband or anyone else.

On cross-examination, Rachael testified that she is supposed to take an anti-depressant every day, but she does not always do so, and she had been seeing a therapist daily. Rachael confirmed she had admitted herself to mental health within two weeks of the trial, when she was kept 72 hours, and again in 2011, when she was kept two weeks. Rachael had been running Multani's business on her own; the towing business was no longer operating but she was trying to keep the limo business going.

Rachael testified the only thing she remembered about the November 18, 2010 incident was that they were arguing; she said they would argue two to three times every day and she usually started the arguments. On that day, she kept poking at Multani and he kept telling her to leave or he would call the police and have her arrested, which "pissed [her] off" because she did not feel like he was paying attention to her. She did not remember talking to an officer that day. In response to a defense question, Rachael volunteered that Multani had never been "in custody." Defense counsel asked, "He had been in custody before, hadn't he?" Rachael responded, "not like this, no," by which she

meant that "when he went to jail," he was released after a few hours. Rachael confirmed Multani went to jail because of complaints she had made.

At the conclusion of cross-examination, there was an off-the-record discussion initiated by the prosecutor. When the prosecutor resumed redirect examination, he asked Rachael, without objection, whether Multani had been convicted in 2004 of domestic violence against her causing injury. Rachael confirmed that had occurred. The trial court told the jurors that this testimony, "like the testimony about the alleged incident in November, is also received only as it may reflect on the credibility of the witness, and not for any other purpose." Rachael admitted that on that occasion, Multani spent more than a few hours in jail. The prosecutor also asked Rachael if there had been other incidents where Multani had been arrested and spent time in custody for domestic violence against her. Rachael answered: "Yes, but I also had to." The trial court told the jurors as to the last answer, "it may only be considered by you as it may reflect on the credibility of this witness, and not for any other purpose." On re-cross, Rachael testified she did not seek prosecution all those other times and Multani spent only a "few hours" in jail for the case to which he pled guilty or no contest.

After Rachael's testimony, the trial court explained, outside the jury's presence, that Rachael's statement that Multani had never been in custody opened the door to some inquires about the various complaints. The trial court said counsel could ask about the half-dozen complaints and the conviction to impeach on that issue with the same limiting instruction. The trial court stated these were "significantly probative" since Rachael "hedged on a lot of things," especially since she had no recollection of her head being slammed into a cinder block. Based on Rachael's testimony, the trial court thought "she's got enough in now that clearly the jurors could conclude her failure of recollection now is feigned, and that she therefore could be impeached with the prior inconsistent statements." The trial court assumed they were going there next with Officer Depew and stated it would instruct again with a limiting instruction as to that.

13.

City of Fresno Police Officer Steven Depew was then called to testify. Before he began, the trial court informed the jury that, "[a]s to this witness as with the previous descriptions by the last witness of any incidents of domestic violence, all of those descriptions, all of this testimony is received only as it may bear on the credibility of Rachael Singh, and not for any other purpose." Depew testified that he was dispatched to Multani Towing on November 18, 2010, where he made contact with Rachael, who had a pretty significant lump on the side of her head that she said Multani caused.

Rachael told Depew she had been at the business about seven minutes before Multani assaulted her. The couple had been arguing about Rachael's use of a business computer and a call Multani received from a woman when Multani told her to "get the hell out of here" and started yelling at her. Not wanting to be assaulted again or to continue the argument, Rachael got to her feet. As Multani tried to push her out of the office, he gave her a shove by her head, which caused her head to slam into a cinder block partition wall. Rachael fell to the ground; her head was not cut. Rachael got up and walked out the door; when she got to the parking lot, she started running. She pulled her cell phone out of her pocket and started dialing 911, but Multani chased her down and grabbed the cell phone from her.

Rachael screamed for help and ran through a secondary door to the business to call the police from a landline phone. Multani pursued her into the room, backed her into a corner, and grabbed an "Indian sword" that was in the room, which has an approximately three-foot long curved blade made of chrome or stainless steel, and held the sword to his own throat. When Rachael started screaming, Multani held the sword about two to three inches from her face, said he should kill her and asked if she wanted to call the cops. Still holding the sword towards her face, Multani said "If you don't get the fuck out of here, I'm going to kill you." Rachael stated she had been assaulted before and did not want to be assaulted further, so she slowly got to her feet and walked toward the door; when she got to the parking lot, she began running and screamed for help. Multani

14.

pursued her again through the parking lot clutching his waistband, from where she had seen him pull a handgun during a prior disturbance, but she was able to run away from him. Rachael was afraid Multani was trying to retrieve a handgun from his waistband and would shoot her in the back. She ran to a women's shelter that was next door to the towing business and asked a lady to call the police for her.

On cross-examination, Depew testified Rachael, who was emotional, red faced, tearful and crying, was not bleeding and did not leave in an ambulance. It did not appear to him that she had been on drugs. Multani had left the scene in his car; Depew called the cell phone number Rachael provided for Multani several times, but he never talked to Multani. While there was no way for him to tell if Rachael was telling the truth, based on her emotional state and injuries, he did not suspect she caused the injury to herself and did not have any reason to doubt she was telling the truth.

When instructing the jury, the trial court gave CALCRIM No. 303, the standard instruction regarding evidence that has been admitted for a limited purpose, and CALCRIM No. 226, the standard instruction on factors the jury may consider in assessing a witness's credibility, which include whether "the witness's testimony [was] influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided," and "[t]he witness's behavior while testifying," attitude of the witness toward this action or toward the giving of testimony.

When the prosecutor started to relate the details of the November incident in closing argument, defense counsel objected, asserting this went to Rachael's credibility, not to Multani's. The prosecutor told the trial court that was the context of "all this." The trial court responded that it expected counsel would make clear the subject he was discussing related to Rachael's credibility and not some other purpose. The prosecutor then linked the incident to Rachael's lack of credibility concerning her testimony that she did not warn Dawar.

15.

C. Analysis

The trial court's evidentiary rulings are reviewed for abuse of discretion. (*People v. Geier* (2007) 41 Cal.4th 555, 586, citing *People v. Jablonski* (2006) 37 Cal.4th 774, 821; *People v. Rowland* (1992) 4 Cal.4th 238, 264.) This includes a trial court's ruling on whether evidence is relevant, and not unduly prejudicial, for purposes of admissibility. (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) Where a discretionary power is statutorily vested in the trial court, its exercise of that discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd matter that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, citing *People v. Jordan* (1986) 42 Cal.3d 308, 316; see also, *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1145 [determination of whether probative value of evidence is outweighed by prejudice].)

Multani contends the trial court erred in admitting the domestic violence evidence because it was irrelevant, admitted only for the purpose of contradicting it, and led to a "major trial-within-a-trial on [his] wife-abuse that had nothing to do with the case at hand."

We first note that while Multani asserts "the trial court sustained its own sua sponte objection" to the admission of the November incident, the ruling actually was made at the pretrial hearing.[10] Accordingly, we may assess the trial court's ruling only on the facts made known to it when it made its ruling. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491; *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425.) Since Multani did not object to either Rachael's or Depew's testimony when it was given, the pretrial findings of relevance and that the evidence was more probative than prejudicial are the

_____

[10] In support, Multani cites to the point during Rachael's testimony when the trial court first told the jury they could consider the November incident only as to how it may affect the witness's credibility. This statement, however, was an instruction, not an objection.

only rulings on this issue subject to review.  (See *People v. Holloway* (2004) 33 Cal.4th 96, 133.)

Multani argues the November incident is not relevant to any issue in the case because the only logical conclusion to be drawn from it is that he is the type of person who attacks people with deadly weapons and therefore solicited Dawar's murder, citing *People v. Avitia* (2005) 127 Cal.App.4th 185 (*Avitia*), and *People v. Archer* (2000) 82 Cal.App.4th 1380 (*Archer*).[11]  Accordingly, Multani contends, the admission of this evidence violated section 1101, subdivision (a), which provides that, with certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specific occasion."

The November incident, however, was admitted for a purpose other than to show Multani's propensity to engage in assaultive behavior, namely Rachael's credibility, and therefore it was admissible under one of the exceptions listed in section 1101, namely section 1101, subdivision (c) ["Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness"].  Moreover, the evidence was properly received under section 780, subdivision (f).[12]  As the trial court found, the November 2010 domestic violence incident was relevant to Rachael's

---

[11] Multani's reliance on both cases is misplaced.  In *Avitia*, the appellate court held the trial court erroneously admitted testimony that gang graffiti was observed on posters because the gang evidence was completely irrelevant to any issue at trial.  (*Avitia*, *supra*, 127 Cal.App.4th at pp. 192-193.)  In *Archer*, the appellate court concluded evidence that the defendant possessed knives that could not be connected to the charged crime was irrelevant to the issues in the case and therefore inadmissible.  (*Archer*, *supra*, 82 Cal.App.4th at p. 1392).  In contrast to these cases, here the November incident was relevant to an issue in the case, namely Rachael's credibility.

[12] Section 780, subdivision (f) provides that the jury may consider in determining a witness' credibility "[the] existence or nonexistence of a bias, interest, or other motive."

17.

credibility because it tended to explain why Rachael would deny warning Dawar that Multani threatened to harm him, namely because she feared Multani.

Multani contends the November incident, as well as the other attacks, only were admissible if he testified, citing section 785 and *People v. Fritz* (2007) 153 Cal.App.4th 949, 956 (*Fritz*). Section 785, however, does not support Multani's contention, as it provides only that a witness's credibility "may be attacked or supported by any party, including the party calling him[,]" and, as explained in the Law Revision Commission Comments, serves to eliminate "the present restriction on attacking the credibility of one's own witness." (§ 785; Cal. Law Revision Com. Com., 29B West's Ann. Gov. Code (1995 ed.) foll. § 785, p. 635.) Since here section 785 allowed the prosecutor to attack Rachael's testimony, despite calling her as a witness, that section actually supports the use of the November incident to impeach her.

*Fritz* also does not help Multani. There, the appellate court held it was improper for the trial court to allow the prosecutor to offer into evidence the defendant's statement to officers denying any history of petty thefts and then to impeach that statement. This was because the statement was relevant only to the prosecutor's plan to impeach it, as the defendant did not testify and the trial court had ruled the evidence of his priors inadmissible under section 1101. (*Fritz, supra*, 153 Cal.App.4th at p. 956.) In contrast here, the November incident was relevant to Rachael's credibility, and therefore admissible.

Multani asserts that beating Rachael violently in November 2010, if true, does not have a tendency to prove that she was biased or motivated to lie in his "separate case concerning a third party incident that occurred some four months later." We disagree, as the November incident provides a reason for Rachael to testify to protect her husband, namely to avoid being the target of domestic violence in the future.

Multani further asserts the issue at trial was whether Rachael lied about whether Multani beat her. However, this was not the reason the evidence was admitted; instead, it

18.

was admitted on the issue of whether Rachael lied about warning Dawar that Multani wanted to harm him. Multani argues the November incident adds nothing to that question. But that incident provides an explanation for why Rachael might lie about warning Dawar, i.e. that she feared being beaten by Multani. Multani contends this evidence was unnecessary to impeach Rachael, as the prosecutor was able to impeach her with telephone records that showed she called Dawar on September 26, 2010 from a blocked number. But that evidence did not impeach her testimony in which she denied telling Dawar during that conversation that Multani intended to harm him; the November incident, however, did.

Multani asserts it was unnecessary to go into the details concerning his beating of Rachael in order to impeach her testimony that she did not warn Dawar about Multani or would not lie to protect him. Before deciding to admit the November incident, the trial court weighed the probative value of the evidence against the potential for prejudice and, after balancing, determined it was more probative than prejudicial. Multani's argument essentially is that admission of the November incident was unduly prejudicial.

This turns on the potential for misuse of the evidence. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is "prejudicial." The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."'" (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

Using evidence of domestic violence to address a witness' credibility is not a misuse of that evidence. There is nothing here to suggest the jury would have used evidence of the November incident for a purpose other than that for which it was

19.

admitted, i.e. to weaken Rachael's credibility.  The trial court gave appropriate limiting instructions both during the testimony of Rachael and Depew, and prior to deliberations.  A trial court's exercise of discretion under section 352 "'will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice. [Citation.]  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Green* (1995) 34 Cal.App.4th 165, 182-183.)  The trial court here did not exceed the bounds of reason in admitting the prior domestic violence evidence.

      II.     Mistrial

Multani contends the trial court abused its discretion in declining to declare a mistrial after a police officer volunteered during his testimony that he had met with Yzaguirre when Yzaguirre was shot.  This testimony violated the trial court's in limine order excluding evidence that Yzaguirre had been shot.  As we will explain, the trial court was well within its discretion to decline to declare a mistrial and the remedy of an extensive corrective jury instruction eliminated any possible prejudice.

      A.  Background

While trial in this case originally was scheduled to begin on November 30, 2011, it did not because Yzaguirre was shot in the chest the day before.  The trial was rescheduled; prior to its start, the trial court ruled in pretrial proceedings that the shooting of Yzaguirre, as well as other attempts to intimidate him, were to be excluded from the trial.  The parties were responsible for advising their witnesses of the trial court's ruling.

During trial, the People called Fresno Police Department Detective Michael Scholl to testify about his role in the Multani investigation.  On cross-examination, defense counsel asked Scholl how many times he met with Yzaguirre in person.  Scholl responded:  "I never met with him alone.  I was always with Detective Imirian, and – including the initial debriefing, there were two – I believe there were two events just prior to him entering Mr. Multani's business that I was with Detective Imirian during the

debriefing itself. There was the red barn incident. There was also when he was – when he was shot I had met with him in the ---" Defense counsel immediately interrupted, stating "Objection, Your Honor. Ask that answer be stricken." The trial court sustained the objection and struck the testimony.

After Scholl completed his testimony, a discussion was held on the record outside the jury's presence. The trial court explained it sustained the objection and granted the motion to strike, but did not reread the testimony to avoid drawing further attention to the statement. Defense counsel did not think the court should say anything to the jury. The trial court stated that since the defense was not requesting a mistrial or further admonition of the jury, it did not plan to take any steps unless requested to do so. Defense counsel asked only that at some point during the trial, the court tell the jury that when it strikes evidence, the jury is to disregard it. The trial court agreed.

A short recess was taken, during which one of the jurors gave a handwritten note to the court. The note states that during the defense's questioning of Scholl, "he mentioned about Joe [Yzaguirre] being shot. While it was stricken from the record I still heard the response and became concerned as to who has access to the names of the jurors. Diane told me that she has a sealed envelope with our names but the defense/pros[ecution] does not. I was just concerned that we could be at risk for retaliation should we convict."

After a short recess, defense counsel informed the court he had spoken with Multani, who asked him to "make a motion to dismiss this case based upon outrageous conduct." The trial court responded it had the following options: (1) grant a motion for mistrial if one were made; (2) find the officer's conduct was intentional and thereby dismiss the case and declare a mistrial without the defense's request; or (3) "cure the problem with an admonition and by speaking with this juror." Defense counsel confirmed he was not asking for a mistrial, as the case had been going well for the defense, but instead was asking the trial court to find the officer's conduct was intentional

21.

and constituted a prejudicial violation of the order, thereby warranting dismissal and granting a mistrial, not at the defense's request but in the interest of justice. The People would then be prevented from retrying the case, as jeopardy would have attached.

The trial court began with whether the violation of the in limine order was willful. The prosecutor explained that he charged Imirian, his investigating officer, with notifying the other witnesses about the in limine order, which Imirian said he did. At the time of trial, Scholl was on medical leave because he had surgery and was on medication. The trial court recognized Scholl volunteered the information and the issue was whether it was deliberate and designed to result in a mistrial. Imirian told the trial court he advised Scholl directly that he must not mention that Yzaguirre had been shot. Defense counsel argued Scholl's disclosure was deliberate and explained that if a mistrial were granted, Multani was out of funds and would have to be represented by a court-appointed attorney on retrial.

The trial court stated it did not believe instructing the jury to disregard Scholl's statement would cure the problem because the jurors that missed the statement would "now have it ringing loudly in their ears." Consequently, the trial court asked whether, without further admonition or direction, the jurors could hear the case and render a fair verdict, or whether the potential for prejudice was so great as to deny Multani a fair trial. The trial court reviewed the law regarding mistrials and when a defendant can be retried following a mistrial if the defendant did not consent to it.

The trial court did not believe it could conclude that this was an intentional effort to thwart a fair trial for Multani, which left it with the decision whether to grant a mistrial despite the defense's decision not to request it, because the jury was so prejudiced by the statement that Multani could not get a fair trial. The trial court was concerned, however, that if it granted a mistrial, the only remedy was a retrial at Multani's expense which, according to defense counsel, he was unable to afford.

22.

The trial court decided to question the juror who sent the note outside the jury's presence, after which it would consider whether it should proceed with an admonition that basically said the jury should assume the police are prejudiced against Multani because of Scholl's conduct. The juror confirmed she had not discussed this issue with the other jurors and had not heard any other juror express a concern about Scholl's statement. The trial court assured the juror that juror identities were kept confidential and could only be made available to the attorneys and their investigators after a post-trial proceeding of which she would receive notice, and any release of information would be subject to a protective order. With those assurances, the juror believed she could be fair-minded about the case, could decide the case based only on the evidence received and instructions of the court, and could treat the information as though she never heard it. The trial court also advised the juror that if any other juror attempted to use the stricken information during deliberations, she could tell them not to and advise the court about it. The trial court was certain the juror would follow these instructions.

Consideration of whether to call a mistrial continued outside the jury's presence. The trial court again raised the issue of whether an admonishment to the jurors was necessary, stating the issue was "[u]nclear at this point[,]" and thought about telling the jurors they should consider the violation of the court's order as evidence of bias on behalf of the entire Department. Defense counsel stated that if the trial court was going to admonish the jury it should do that and asked the trial court to do what it thought was right in its discretion.

The trial court prepared a proposed admonition for the jurors during the lunch recess. When the trial reconvened, the trial court explained to the parties outside the jury's presence that while it had considered giving a more extreme admonition, it thought it inappropriate because it did not think there was any reason to believe this was an intentional effort to violate the court's orders, prejudice the jury, or prompt a mistrial for a nefarious purpose. The trial court further explained that when one combined the brief,

23.

limited context, in which Scholl mentioned the shooting and the fact he's on pain medication, there was no point in suggesting to the jurors that there was a nefarious purpose; instead, the draft instruction tells the jury twice that the shooting incident has absolutely nothing to do with the case, not just with Multani, and it would unfair for them to consider it for any purpose.

Defense counsel objected to the proposed admonition, requested a section 402 hearing to determine whether the violation was blatant or intentional, and reiterated Multani was not asking for a mistrial because he could not afford another trial, but instead was asking the court to dismiss the case in the interest of justice under Penal Code section 1385. The trial court asked Imirian if he had discussed the stricken testimony with Scholl. Imirian responded he had and that Scholl was really apologetic and felt badly about the situation. The prosecutor added that Scholl was unable to drive to court when he testified due to the medication he was taking; the prosecutor was certain Imirian had advised Scholl not to mention the excluded evidence and he had confirmed with Imirian that Imirian had done so; and the prosecutor had no reason to believe Scholl would make the mistake he did. The prosecutor argued the slip was not intentional and was merely a mistake.

The trial court was satisfied that Imirian had admonished Scholl and Scholl may have lapsed because he was on medication. The trial court accepted Imirian's statement that Scholl was remorseful when advised he violated the court's order and did not believe it necessary to conduct a section 402 hearing. The trial court did not find the violation egregious, as Scholl mentioned only that Yzaguirre was shot and did not describe the shooting. The trial court denied the motion to dismiss without prejudice, as the issue could be revisited should a juror provide a note on the issue in the future.

When the jurors returned to court, the trial court instructed the jury as follows: "Ladies and gentlemen of the jury, before the noon recess a witness testified that he met with witness Joe Yzaguirre after he was shot. I ordered that testimony stricken from the

24.

record. When testimony is stricken from the record, you are to treat the testimony as though you had never heard of it. I looked at the circumstances under which Mr. Yzaguirre was shot in great detail before any of you were summoned to this courtroom. I concluded that the incident had absolutely nothing to do with this case. That is why you have not heard and will not hear about the incident in this trial, and that is why the witnesses and attorneys were instructed not to mention it. When I instruct you not to consider evidence that has been stricken from the record for any purpose I expect you to follow that instruction. If any of you feel you will have any difficulty following that instruction, please write me a note so we can discuss your concerns in greater detail. As with my questions during jury selection there are no right or wrong answers to my questions, only truthful answers, and I expect each of you to be entirely truthful and candid on this subject. Because the shooting incident had absolutely nothing to do with this case, it would be unfair for you to consider the stricken testimony for any purpose. I'm counting on each of you to follow all of my instructions in this case, including the instruction that you are to disregard stricken testimony. And if you feel you cannot follow that or any other instruction, I am counting on you to let me know that. Thank you."

These is nothing in the record indicating that any juror thereafter expressed a concern about the instruction or anything else related to the stricken evidence. In addition to being instructed throughout the trial at the appropriate intervals, the jury was instructed at the beginning and end of the trial not to consider stricken testimony.

B. Analysis

A trial court should only declare a mistrial when the opportunity for a fair trial has been irreparably lost and cannot be cured by admonition or instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 573.) A witness's volunteered statement can provide the basis for a finding of incurable prejudice. (*People v. Wharton* (1991) 53 Cal.3d 522, 565 (*Wharton*).) Determining whether to grant a mistrial or to utilize other remedies is within

the sound discretion of the trial court. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Undoubtedly, the police officer's volunteered statement that Yzaguirre had been shot was improper. As we have noted, however, the trial court immediately sustained defense counsel's objection and struck the testimony. At the next break, the trial court then sought to determine the appropriate remedy. Significantly here, the defense refused to ask for a mistrial. After conferring with Multani, defense counsel was satisfied with its case so far and did not want a mistrial where the prosecution might be able to retry the case. Instead, the defense wanted a dismissal of the case or for the court to declare a mistrial on its own motion in the hope that principles of double jeopardy would bar retrial. In other words, absent a dismissal or a mistrial that would have the same result, the defense was satisfied with the state of the evidence at that time and refused to request a mistrial.

On appeal, Multani does not challenge the trial court's finding that the mention of the shooting was not intentional or its denial of his motion to dismiss the case. Instead, he argues the trial court should have declared a mistrial because the prejudice was incurable.

The case of *Wharton, supra,* 53 Cal.3d 522, is instructive. There, the witness had visible facial injuries; before he testified the trial court warned the prosecutor to make it clear that the defendant was not involved in any retaliation towards the witness. (*Id.* at p. 563.) When questioned about being beaten up in jail, the witness confirmed the defendant did not do it. But when asked to explain what a snitch was, the witness blurted out that defendant "got the word out." Defense counsel sought a sidebar; the jury was excused and the defense moved for a mistrial, claiming the witness's assertion was extremely prejudicial because defendant was charged with a violent crime. Because the

26.

jury was waiting, everyone agreed the prosecutor should proceed with another witness. After that testimony, a juror asked what was allowed of the first witness's testimony. (*Id.* at p. 564.) Following a weekend break, the trial court denied the motion for a mistrial and, with the consent of defense counsel, admonished the jury to disregard the statement the witness blurted out and that the defendant had nothing to do with the witness's injuries. On cross-examination, the witness explained his injuries were caused by a former neighbor following a dispute over rent. (*Id.* at p. 565.)

Our Supreme Court found no abuse of discretion in denying the motion for a mistrial. The Court found no incurable prejudice because the witness did not directly implicate defendant in the beating, the trial court gave a direct and pointed admonishment regarding the volunteered testimony, and on cross-examination the witness clarified that the defendant had nothing to do with the beating by placing the blame entirely on another for unrelated reasons. (*Wharton, supra,* 53 Cal.3d at p. 566.)

In both this case and *Wharton*, the challenged testimony was the result of the witness volunteering something; it was not elicited by the prosecution's questioning and the trial court did not find any prosecutorial misconduct. In both cases the trial court responded by admonishing the jury. Here, the admonition occurred more promptly, before any other witness testified. The trial court's admonition was not simply to disregard Scholl's statement that he met with Yzaguirre after he was shot; rather the trial court told the jury that before the trial began it had reviewed the circumstances under which Yzaguirre was shot in great detail and concluded "the incident had absolutely nothing to do with this case." The trial court did not simply try to un-ring the bell; instead, it put to rest any suspicion that the incident was linked to this case by declaring it was not.

While Multani complains the jury could still have inferred that the incident had something to do with *him*, we disagree that the jury would have taken the instruction to that extreme. By telling the jurors the incident had absolutely nothing to do with this

27.

case, the trial court was telling them it had nothing to do with Multani. We presume that the jury understood and followed the trial court's admonition not only to disregard Scholl's statement, but that the incident had nothing to do with this case. (*People v. Burgener* (2003) 29 Cal.4th 833, 870; *People v. Waidla* (2000) 22 Cal.4th 690, 725.)

What this issue boils down to is one gratuitous, albeit improper, remark about which the jury was promptly and thoroughly admonished. The defense sought termination of the prosecution as the remedy, and absent such termination refused to ask for a mistrial which could permit retrial. While there is no harm in the defense seeking an extreme and unwarranted remedy, the course chosen by the court here to carefully instruct the jury was not an abuse of discretion.

III.     Prosecutorial Misconduct

Multani contends the prosecutor committed misconduct during closing argument by improperly disparaging defense counsel and vouching for Yzaguirre's credibility. The threshold problem, as Multani acknowledges, is that, while defense counsel objected to the rebuttal argument after the jury began its deliberations and raised this issue in a new trial motion, defense counsel did not object during the prosecutor's argument to any of the statements he now contends constituted misconduct.[13] A claim of prosecutorial misconduct is usually forfeited by failure to object. (*People v. Coddington* (2000)

_____

[13] After the jury began its deliberations, defense counsel stated he wanted to place on the record an objection to the prosecutor's rebuttal argument as he "was put on trial here" and felt the prosecutor was improperly attacking his tactics. The court noted the objection, explaining that while it did not prefer the prosecutor's style, it thought it was within the bounds of proper argument. The prosecutor interjected that many times he also used defense counsel's name to compliment him. The court responded that happened "occasionally"; for the most part the argument was "highly critical of him and his efforts." The court, however, did not view any of it as personal vouching, or suggesting to the jury there was some evidence that was improperly discussed, concealed, or mischaracterized. The court did not perceive there was anything approaching misconduct and it did not take any action because it did not get a specific objection to any particular reference by the prosecutor.

28.

23 Cal.4th 529, 595, overruled on other grounds by *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)  Multani, however, argues his defense counsel was ineffective for failing to object.  (See *People v. Pitts* (1990) 223 Cal.App.3d 606, 693.)

In this context, Multani must show that defense counsel's omission fell outside the range of an objective standard of reasonableness.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216 (*Ledesma*).)  When the claim of misconduct is based on arguments or comments the prosecutor made before a jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'"  (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)  If the challenged statement or argument was not misconduct then, of course, it would not be outside the range of competence for counsel to fail to object.  Even where the prosecutor may have engaged in objectionable conduct, mere failure to object does not establish incompetence. (*Wharton, supra,* 53 Cal.3d at p. 567.)  Multani must show that counsel's omission involved a critical issue, and that the failure to object could not be explained as a reasonable trial tactic.  (*People v. Lanphear* (1980) 26 Cal.3d 814, 828-829, judgment vacated and cause remanded (1980) 449 U.S. 810, opinion reiterated (1980) 28 Cal.3d 463; *People v. Jenkins* (1975) 13 Cal.3d 749, 753.)  If counsel's performance does fall outside the range of reasonable competence, Multani then bears the burden of showing that defense counsel's omission resulted in prejudice.  (*Ledesma, supra,* at p. 217.)  We shall apply these standards to our review of the instances of misconduct Multani cites.

Multani asserts the prosecutor improperly disparaged defense counsel three times during rebuttal.  While a prosecutor may vigorously argue his or her case, marshalling the facts and arguing inferences to be drawn from them, it is improper to imply that defense counsel fabricated evidence or to portray defense counsel as the villain in the case, as the defendant's conviction should rest on the evidence, not defense counsel's derelictions. (*People v. Sandoval* (1992) 4 Cal.4th 155, 183 (*Sandoval*).)  Thus, "[i]t is misconduct when a prosecutor in closing argument 'denigrat[es] counsel instead of the evidence.

29.

Personal attacks on opposing counsel are improper and irrelevant to the issues." (*People v. Welch* (1999) 20 Cal.4th 701, 753.) There is no misconduct, however, when the prosecutor "pointedly highlight[s]" the contradictions in a defendant's case (*ibid*), characterizes inconsistent testimony as "'lies'" (*Sandoval*, *supra*, 4 Cal.4th at p. 184), or argues the defense is attempting to confuse the jury. (*People v. Kennedy* (2005) 36 Cal.4th 595, 626-627, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) When a claim of prosecutorial misconduct is based on denigration of opposing counsel, "we view the prosecutor's comments in relation to the remarks of defense counsel, and inquire whether the former constitutes a fair response to the latter." (*People v. Frye* (1998) 18 Cal.4th 894, 978, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

First, Multani points to the beginning of the prosecutor's rebuttal, in which he argues: "A lot of passion from [defense counsel], had a good deal of it. But that passion has got to be connected with the facts in this case, not an incorrect summary of what happened. Don't do it. Hold off. Completely incomplete. And we'll talk about all that is said there. But grossly incomplete and just – just flat-out misleading." He asserts the statement that defense counsel's closing was "grossly incomplete" and "flat-out misleading" disparaged defense counsel.

As the People point out, the characterization of defense counsel's argument as incomplete and misleading was simply a remark made at the beginning of rebuttal by which the prosecutor was exhorting the jury generally to think critically about the evidence, not merely about what defense counsel emphasized. As such, it was merely responsive to defense counsel's arguments and therefore acceptable under *People v. Stanley* (2006) 39 Cal.4th 913, 952, which held there was no misconduct where the prosecutor's remarks were responsive to defense counsel's own arguments to the jury on the state of the evidence and merely urged the jury not to be influenced by counsel's argument, but instead to focus on the testimony and evidence in the case.

Next, Multani points to the prosecutor's statement that defense counsel apparently did not believe a witness he called to testify, Nelson: "I give [defense counsel] credit in how he, um, worked through Mr. Nelson. He uses him for his theme, which is the setup. But it's clear when he summarized Mr. Nelson, I don't even – you know, it appears he may not even believe that witness. And here's some reasons why. [¶] He includes all types of new information that [defense counsel] and again, to his credit, even stipulated that his investigator lied about. He's saying his investigator said, "I told [defense counsel]" and [defense counsel] was like, 'I [was] never told those pieces of information about the girlfriends, about the gang stuff and not coming forward.' And that's to his credit."

Nelson testified that he told defense investigator Robert Gonzalez[14] everything he testified to at trial, including that he did not report Yzaguirre to jail officials because Yzaguirre told him he was affiliated with Bulldog gang members and Nelson believed Yzaguirre had been arrested with validated gang members, and that Yzaguirre gave Ty phone numbers for a girlfriend named Vegas, his wife Bobbi, and Sasser. The prosecutor called investigator Gonzalez as a rebuttal witness. He testified he first met with Nelson on May 17, 2011, and met with him eight or nine times thereafter, but only wrote a report after the first meeting, which did not mention Sasser. Gonzalez further testified he told defense counsel about Nelson's statements concerning Sasser and his fear of Yzaguirre's gang connections.

After Gonzalez testified, the parties entered into a stipulation in which they agreed that Gonzalez never advised defense counsel about the information concerning Sasser, Yzaguirre's ex-wife Bobbi, or a girl named Vegas, or the allegation of Yzaguirre's gang connections. In the defense's closing, defense counsel pointed out that two people

---

**14** This witness should not be confused with Detective Robert Gonzales, whom Yzaguirre called to report that Multani solicited him to commit murder.

testified about Yzaguirre's character for being a truthful person: "Now, one is Craig Nelson. Take it for what it's worth. He is a convicted felon, too. He is doing state prison time. He came back here, he was brought back here to testify. 'I was in with him for a number of months and I can definitely tell you he's not a truthful person.' Said he was manipulative, scandalous, I think he used the word treacherous. Again, it's coming from two convicts, no question about that. But he would not trust him."

In light of the trial testimony and defense counsel's argument, it is apparent that the prosecutor's argument here was a fair comment upon the evidence at trial and responsive to defense counsel's statement to the jury to take Nelson's testimony for "what it's worth." Moreover, it is unlikely the jury construed the remark concerning defense counsel's belief in an objectionable fashion, as the prosecutor went on to explain why Nelson was unworthy of belief.

The third statement Multani challenges is the prosecutor's statement that "passion without facts is trickery[,]" which was part of the following argument: "And so with this theme, passion without facts is trickery, you had [defense counsel] with his witnesses and even with, um, the People's, try to make some connection with where Mr. Yzaguirre once lived and whether this theft, burglary, happened on 7/8/2010. There [was] no facts to show they are even close with one another, but still he tried to insinuate that with some passion." This argument was responsive to defense counsel's implication in his closing argument that because Savage's gun was stolen from the Oakhurst/Coarsegold area and Yzaguirre lived in the foothills, Yzaguirre had something to do with the theft, and was therefore proper. Moreover, the prosecutor merely was urging the jury to put defense counsel's argument into context, decide whether the facts supported it, and if they did not, to not fall for the passion of the argument. Even if the prosecutor's choice of words could be considered intemperate, there was no harm because it is not reasonably probable the jury took this statement as anything other than rhetoric. (See, e.g., *People v. Breaux* (1991) 1 Cal.4th 281, 306.)

Finally, Multani asserts the prosecutor improperly vouched for a prosecution witness when he argued: "But nonetheless, as I noted briefly in my opening, although some of the rebuttal may be unnecessary for your purposes, I do think it's important for Mr. Yzaguirre. He has been defamed, he has been trashed. And to a certain degree you have to understand the context of these people who are saying things about him to at least put what is being said in somewhat of perspective. I think he's owed that for saving a person's life." !(RT 4020)!

A prosecutor is entitled to comment on the credibility of a witness based on evidence adduced at trial. (*People v. Thomas* (1992) 2 Cal.4th 489, 529.) "Although a prosecutor may not personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) Prosecutorial assurances regarding honesty or reliability of a prosecution witness, supported in the record, do not constitute improper "vouching." (*People v. Medina* (1995) 11 Cal.4th 694, 757.) What a prosecutor may not do is to suggest that he or she has information undisclosed to the jury bearing on the issue of credibility, veracity, or guilt. The danger in such remarks is that the jurors will believe that some evidence, known only to the prosecutor, has been withheld from them. (*People v. Green* (1980) 27 Cal.3d 1, 35, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 241; *People v. Padilla* (1995) 11 Cal.4th 891, 945–946, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

We do not see the prosecutor's remarks as improper, as the prosecutor did not suggest he had undisclosed information on Yzaguirre's credibility. Instead, the prosecutor argued that defense witnesses had attacked Yzaguirre's credibility by defaming and trashing him. The prosecutor then urged the jury to understand the context of the testimony of these witnesses in order to put their testimony into perspective and stated the jury "owed" that to Yzaguirre "for saving a person's life." In so arguing, the

prosecutor was not personally vouching for Yzaguirre's credibility, but was arguing in essence that Yzaguirre was telling the truth.  The argument was not improper.

Because there was no prosecutorial misconduct, there was no ineffective assistance of counsel.

IV.    Cumulative Error

Multani argues that reversal of the judgment is imperative since prejudicial error arose from the cumulative impact of individual errors.  Since Multani fails to persuade us that any error occurred or that any assumed error was prejudicial, his cumulative error argument is meritless.  (See *People v. Gonzales* (2011) 52 Cal.4th 254, 308; *People v. Heard* (2003) 31 Cal.4th 946, 982.)

## DISPOSITION

The judgment is affirmed.


_____
Gomes, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Franson, J.